## T. W. Kinser, et al., v. Clement C. Barnes, et al.

### Gen. No. 4,476.

1.  VERDICT—*when not set aside.*  A verdict not clearly and palpably against the weight of the evidence, will not be set aside on review.

Action of assumpsit.  Appeal from the Circuit Court of LaSalle County; the Hon. R. M. SKINNER, Judge, presiding.  Heard in this court at the October term, 1904.  Affirmed.  Opinion filed March 8, 1905.

DUNCAN, DOYLE & O'CONOR, for appellants.

HUTTMANN, BUTTERS & CARR, for appellees.

MR. PRESIDING JUSTICE FARMER delivered the opinion of the court.

Both parties to this suit are contractors in railroad construction work.  In 1903 the Illinois Valley Traction Company was building a road from LaSalle to Ottawa, and let a contract to appellants to do the construction work for a portion of its line immediately east and west of Utica. Sometime in May appellees applied to one Henderson, the agent and representative of appellants, for a sub-contract to do part of the work.  Henderson and C. C. Barnes, one of appellees, went over what they understood to be the line of the proposed road to examine the nature and character of the work.  After making this inspection, a written proposal was made by appellees under date of May 22, 1903, to do the work between stations 260 and 440, which was east of Utica, for sixteen cents per cubic yard, and between stations 207 and Split Rock, which was west of Utica, for seventeen cents per cubic yard.  The proposition contained this clause:  "It is understood that dry material is to be furnished for embankment."  This proposition was accepted by appellants, and became the original contract between the parties.  At the time it was made, appellees' outfit for doing the work was in Oklahoma, and on account of trouble in securing railroad facilities for shipping, did not arrive at

the work until about the 1st of July. At appellants' sug-
gestion, appellees began work on that portion of the line
east of Utica, which was drier than that west. After en-
tering upon the work, it was discovered the line of the road
did not run exactly as Henderson and Barnes had under-
stood it to do when they made the inspection before the
contract was entered into. Appellees thereupon notified
appellants, whose office was in Chicago, and requested them
to come or send their representative to look at the work.
On the 10th of July, one of appellants and Henderson went
to Ottawa, and there met C. C. Barnes in the office ef Mr.
Nichols, who was the chief engineer of the Illinois Valley
Traction Company. A discussion was had between the
parties there in which Barnes appears to have claimed that
some of the work was in a different location from what it
had been represented to him, and some of it of a different
character from what he had been lead to suppose. It was
finally, however, agreed that he would go on with the work
east of Utica. There is a conflict in the testimony as to what
was agreed upon or said at that time about the work west
of Utica. It appears that at the western part of that work
a large embankment was to be built up to Split Rock, a dis-
tance of several hundred feet. This is called the "big fill."
The base of this embankment in its narrowest part was to
be about sixty feet in width, and at its widest, about 100
feet, and at its highest point at the top about thirty-six feet.
To provide material for the building of this embankment,
an extra amount of land had been procured as right of way
along and adjacent to it. This is called a "borrow pit,"
and was 400 feet wide, 1,128 feet long, and contained about
ten acres. Through this strip of land the embankment or
fill was to be constructed, which would leave about eight
acres of borrow pit.

At the meeting in Nichols' office, Barnes stated he did
not propose to do the work west of Utica, because he
claimed there was not dry material as called for by the con-
tract with which to do it; that the borrow pit from which
the material was to be taken was wet. It does not appear

there was any misunderstanding as to the location of this part of the work. Barnes testified that after some private consultation between one of appellants and Henderson they informed him they would release him from all the work west of Utica except the big fill, but would not release him from that; that he insisted the material with which it was to be made was not in accordance with his contract and could not be obtained from the borrow pit provided to get it from, and that they finally said they would try to let it to some one else, and that he, Barnes, promised if they secured another contractor, when appellees had completed their work east of Utica, they would take their teams to the big fill and help with the work, or if they secured no one else to do it by the time appellees had completed their contract east of Utica, if the material was dry enough so they could put machines and wagons on it, the wagons to haul a yard and a half of earth, they would do the work. Appellees claimed the borrow pit was wet when they had finished the work east of Utica, and refused to go to the big fill. Appellants notified them if they did not do the work they, appellants, would proceed to have it done at appellees' expense. Appellees persisting in their refusal, appellants procured the work done at an expense of $4,124.63, which they claim is $2,864.63 more than appellees had contracted to do it for. There was a balance due appellees on the work done east of Utica, and this appellants refused to pay. This suit was brought to recover that sum, and appellants sought to set off or recoup the damages they claimed to have sustained by reason of appellees' failure to do the work under their contract, to an amount equal to appellees' claim. The trial resulted in a verdict and judgment for appellees for the full amount of their claim, from which this appeal is prosecuted.

Appellants concede that at the meeting in Nichols' office appellees were released from any obligation to do any work west of Utica except the big fill, and there is no dispute that at that time it was agreed if appellees did this work they should be furnished with dry material with which to

make the big fill. It is disputed, however, that anything
was said at that time about the material being such that a
grader, or wagons in which a yard and a half of material
could be hauled, could be used.

Henderson testified there was some conversation when
he and Mr. Barnes first went over the line about using the
grader and wagons to put in the base of the fill, but that
to his recollection there was nothing said about graders
or wagons in Nichols' office. Nichols testified there was
nothing said at that time about the use of graders in mak-
ing the big fill, or wagons to haul a yard and a half of earth.
Kingdon, a young man employed in Nichols' office, testified
he was present when the talk was had between the parties;
that he did not follow it closely, and could not give the de-
tails; that the subject of the big fill was discussed, and that
Mr. Henderson said in substance to Nichols they had agreed
on what was to be done, and that Barnes was to go ahead
with the big fill; that he heard nothing said about graders
or wagons, nor did he hear anything said about dry mate-
rial being furnished. H. L. Kinser, one of appellants, testi-
fied that after an agreement had been reached, Mr. Hender-
son called Mr. Nichols' attention and said he wanted to have
him hear the agreement, and then stated: "Mr. Barnes is
to do all the work east of Utica, and all of the work west
of Utica except the wet work or the station work;" that
there was nothing said by Barnes about the use of a grader
in the borrow pit or wagons that would haul a yard and a
half of material; that nothing of that kind was stated by
anybody at any time during the conversation. This is the
substance of all the testimony taken from the record on this
particular subject. This agreement between the parties and
and the conflict in the testimony of the witnesses is, as to
whether a borrow pit was to be provided appellees in which
they could use a grader and haul in wagons a yard and a
half of earth. We have resorted to the record for this tes-
timony because we are furnished with two abstracts, one by
each party, and each purporting to be a full and complete
abstract of the testimony. If the decision of this case de-

pended entirely upon whether at the making of the verbal contract in Nichols' office, it was agreed appellants should furnish appellees a borrow pit from which to take material to make the big fill in which they could use a grader and wagons, there would be force in appellants' claim that the weight of the testimony is against appellees, but in our opinion the case does not wholly turn upon that question.

The north line of the right of way at the place in question was about ninety feet from the canal and at this place the embankment was to be built on the north line of the right of way. Nichols testified the company had a verbal option upon more land immediately south of the right of way, and a canal waste bank, about one-fourth of a mile east of the big fill, from which to procure material if that within the right of way was insufficient or could not be used.

The meaning of "dry material" in contracts of the kind involved in this case appears to be, material in which the work can be reasonably done with horses and teams without their miring. Some of the witnesses testify it means material in which scrapers, graders and wagons can be used; others that it means only material where scrapers can be used. The testimony of nearly an equal number of witnesses for each side, devoted largely to that question, covers sixty-six pages of appellants' abstract and sixty-four of appellees' and no useful purpose would be served by quoting it. Appellees' contention was that the work was wet within the meaning of their contract, whereas the contract called for dry material and they were therefore not required to attempt to do the work, while appellants contend that within the meaning of the contract the borrow pit afforded dry material. The testimony of the witnesses on this subject, all of whom had either done work in making the embankment from the borrow pit or seen it done, was conflicting. Twelve witnesses testified they considered the borrow pit dry material as understood in railroad construction and twelve testified that it was wet. All were more or less familiar with it. Many of them had

had considerable experience in railroad contracting and construction. Some of them tested the ground by digging test holes with a spade, others by forcing a stick into it to determine how near the water was to the surface. Some of them had worked in removing earth from the borrow pit to the fill in September, October and November and some had not worked there but had seen others doing the work. All of them were in a position to know something about the character of the ground, but the testimony of the witnesses on opposite sides of the case is very inharmonious. After appellees had taken their teams and implements away, appellants engaged a contractor named Elzy to do the work. He began in September and continued till November, when on account of his slow progress the traction company took charge of it themselves. Elzy and his force moved 6,000 or 7,000 cubic yards of earth from the borrow pit while they were at work, by the use of teams and wheel and drag scrapers. This was about one-fifth of the amount of earth required to make the embankment according to the plans when the contract between appellants and appellees was entered into. In our view of the agreement between the parties, appellees could not be required to do the work at the big fill, unless the material provided to do it with was dry as understood in railroad construction parlance. If it be conceded the evidence shows it was no part of the agreement it should be of such character that a grader and wagons hauling a yard and a half of earth could be used, still it was required by the contract to be dry enough to be reasonably successfully handled by some tools or implements by which it could be taken from the borrow pit and placed in the embankment. In the absence of any mention of the character of tools and implements to be used, the evidence is not very clear as to what, according to the custom of the business, is to be understood from such contracts. Assuming that wheel and slip or drag scrapers are proper tools for doing the character of work here contemplated, and that if the material was such that it could reasonably be handled by such tools

it would be the duty of the contractor to do the work, we still are of opinion that from a careful reading of the testimony it cannot be said the jury was wholly unwarranted in finding for appellees on this question, or that the verdict is so palpably contrary to the evidence as to justify an appellate court in disturbing it. While it is true appellants proved that a large quantity of material was taken from the borrow pit and placed in the embankment before the ground was frozen, it is also true there was evidence tending to show it was done in very wet miry ground and under rather serious difficulties on that account. The evidence showed beyond question that the borrow pit was low, bottom ground. It was not far from the Illinois river and was subject to overflow from it. The water level in the canal was about thirteen feet higher than the surface of the pit and the seepage from the canal ran through the borrow pit in several small streams. That it was wet in the ordinary acceptance of the term cannot be denied, and we would not under the conflicting state of the evidence be warranted in holding a verdict palpably wrong that found it was wet within the meaning of the contract.

Appellants argue, that, as under the known custom and usage under contracts of this kind, it was the duty of the company for whom the work was being done to furnish material of the kind provided for in the contract, and if it was found that any provision made would not answer the purpose, to make other provisions that would; it was the duty of appellees to have entered upon the work, and if they then found the material provided did not comply with the contract, give notice of that fact and demand material that would. In such case it is said if none could be, or was supplied, they would be released from the contract. In support of this position it is urged the traction company had made provisions for procuring other material. The evidence tends strongly to show that at the interview in Nichols' office and repeatedly thereafter, appellees claimed the borrow pit was wet and objected to doing the work on that account, while appellants insisted on them going on

and performing the work, apparently claiming the material in the borrow pit was what was called for under the contract. If, as appellees claimed, the ground was wet, we think their repeated statements to appellants to that effect and refusal to go on with the work was ample notice. To have reinforced that notice with a demand for different material could not have been more effective as notice that the work could not be done with what had been provided, nor did the failure to make demand prejudice appellants. If the borrow pit was not dry within the meaning of the contract, appellees were not bound to do the work and we do not think they were obliged to demonstrate that it was wet to appellants' satisfaction by attempting to work it. If they chose to refuse to attempt to do the work and thus demonstrate the condition of the material, they simply took the chances of proving their position without an actual test. Tests were made by appellees in the presence of appellants and the traction company or their representatives, by pushing sticks in the ground, looking over the surface generally and then and there claiming the pit was wet, so that both appellants and the company had notice. It is claimed the stick test is not as reliable as that made by appellants by digging holes. That is perhaps true, but if the stick test showed water near the surface, as witnesses swore it did, that would be a physical fact that must be considered reliable. Besides it would seem from the evidence in this record that appellants' contention has been all the time, was at the trial, and in fact still is, that the borrow pit was dry material. They proved that about 17,000 cubic yards of material had been taken from it after appellees refused to do the work and endeavored to prove by a number of witnesses that it was dry, within the meaning of the contract. No other borrow pit was offered appellees, though it is claimed conditional arrangements had been made therefor, and it seems clear to us that appellants had no other intention than that the work should be done from the material in the borrow pit described. If the removal of 6,000 or 7,000 yards of dirt by

Elzy under the direction of appellants before the ground froze, did not convince them the pit was wet, nor disclose the necessity for another borrow pit, it is apparent nothing appellees could have done would have done so. The real and meritorious question was, was the borrow pit wet material within the meaning of the contract? Upon that question appellants had a fair trial. Aside from the complaint made as to the verdict being contrary to the evidence, it is not claimed there were any other errors committed on the trial, except as to the giving of one instruction for appellees. We have examined the instruction complained of and considered the points made upon the evidence, and are of opinion there is no reversible error in this record.

The judgment is affirmed.

The motion to tax costs of the additional abstract is denied.

*Affirmed.*